Submitted on briefs February 7, affirmed April 18, 1922.

## YADEN *v.* KINNEY ET AL.

(205 Pac. 980.)

**Fraudulent Conveyances—Evidence Held to Show Conveyance to
Housekeeper was to Defraud Creditors, and That Debtor Owned
Interest in Land Acquired With Proceeds of Conveyance.**

1. In a suit to subject lands held in the name of one defendant
to the payment of judgments against the other defendant, evidence
*held* to show that the conveyance of the judgment debtor's interest
in lands previously owned by the two defendants to the codefend-
ant, who was the debtor's housekeeper, was intended to defraud the
debtor's creditors, and that the debtor owned an interest in lands
subsequently conveyed to the codefendant and paid for from the
proceeds of the sale of the original land, even if the first con-
veyance to the codefendant was in consideration of a debt due her.

From Klamath: D. V. KUYKENDALL, Judge.

In Banc.

A. C. Yaden is a creditor of A. Kinney. Lena
Barkhurst holds the record title to 320 acres of land
known as the Davidson-McClure land. Yaden com-
menced this suit on May 30, 1919, against Kinney and
Lena Barkhurst to subject the Davidson-McClure
land to payment of the indebtedness due Yaden, on
the theory that Kinney owned the land and Lena
Barkhurst was holding the record title for the purpose
of hindering the creditors of Kinney. A trial re-
sulted in a decree adjudging that the defendants were
together the owners of the land; that Lena was hold-
ing the record title for herself and Kinney; that Lena

was so holding Kinney's share for the purpose of aiding him in hindering his creditors; that Kinney was "the owner of such a portion of said premises as to equal in value the amount of" the indebtedness due Yaden; and that the land be sold for the purpose of paying such indebtedness.

Yaden is the holder of four money judgments against Kinney, one in his own right and three as an assignee for collection. At the time of the commencement of this suit the four judgments aggregated approximately $600. The first of these four judgments was obtained on August 10, 1917; the second, on September 4, 1917; the third, on October 25, 1917; and the fourth, on May 25, 1918. Both defendants appealed from the decree of the Circuit Court.

AFFIRMED.

For appellants there was a brief over the name of *Mr. R. C. Goresbeck.*

For respondent there was a brief over the names of *Messrs. Renner & Chastain* and *Messrs. Rutenic & Yaden.*

HARRIS, J.—1. There are three bodies of land which must be kept in mind; one is known as the Kilgore land; another is more frequently referred to as the Harris land, although it is sometimes called the Beaughan land; and the third is known and designated as the Davidson-McClure land. The Kilgore land embraces 81.4 acres. Kinney at one time owned half of the Kilgore land while Lena Barkhurst owned the other half. Kinney conveyed his half to Lena. The plaintiff contends that this transfer to Lena was made for the purpose of hindering Kinney's creditors. After acquiring the half owned by Kinney, Lena con-

veyed the Kilgore land embracing 81.4 acres, to Iva
Drew. Clarence Harris owned an equity in a tract
embracing 62 acres, the record title to which was held
by Beaughan. With part of the proceeds derived
from the sale to Iva Drew, the defendant Lena Bark-
hurst acquired Harris' equity. Subsequently Lena
surrendered her equity in the Harris land, and gave
her note for $500 to Lew A. Davidson in consideration
of the conveyance of the Davidson-McClure land.
Davidson owned 160 acres; and McClure owned 160
acres contiguous to the Davidson land. The 320 acres
of land known as the Davidson-McClure land may be
treated as a single tract of land acquired in a single
transaction, for the reason that negotiations for the
sale were carried on principally by Davidson or his
agent on the one hand, and by Kinney or his repre-
sentative on the other hand. The plaintiff is attempt-
ing to subject the Davidson-McClure land to the pay-
ment of the judgments held by him; and, hence, the
inquiry is: Does Kinney own an interest in the David-
son-McClure land? This question cannot be answered
without giving an account of the relationship which
for several years existed between the defendants, and
of business transactions beginning as early as 1914.

In 1909, Kinney's wife died leaving him with four
children, one of whom, Roe Kinney, was a six or seven
year old boy. Kinney "bached" until becoming
"mighty tired of it" he arranged on February 4, 1912,
for Lena Barkhurst to act as his housekeeper. The
defendant Barkhurst was at that time a married
woman with two children aged respectively one and
two years. The defendant Lena Barkhurst concedes
that she was obliged to accept the employment for the
reason that she was without funds. Kinney promised
to pay Lena $10 per month, with board and lodging

for herself and children, and it was understood that she was to receive more than $10 during harvest "and extra work like that." Later it was understood that she was to receive $30 per month during harvest and at such times as there was extra work to be done, and $15 a month during the remainder of the year. According to the testimony of Lena, harvest and the extra work extended over a period of four months in each year.

In 1913 Lena was divorced from her husband, and, in settlement of their property rights, he conveyed to her two lots in Klamath Falls on April 7, 1913.

The Klamath Development Company, the owner of the Kilgore land, had contracted to sell half of it to Minnie Hozin and the other half to John Corboff. Kinney acquired Corboff's equity, and Minnie Hozin relinquished her equity to the defendant Lena Barkhurst. The Kilgore land was irrigated land and there were unpaid water charges against each half of it. Kinney transferred four lots in Klamath Falls to Corboff for his equity; and Lena conveyed her two lots in Klamath Falls to Minnie Hozin for the latter's equity. The Klamath Development Company, through its representative M. L. Johnson, participated in the negotiations, and as a part of the transaction the Klamath Development Company deeded the Corboff half of the Kilgore land to Kinney and the Hozin half to Lena. The "back water charges" were paid by Kinney. It appears from the record that the conveyances to Kinney and Lena were subject to a mortgage held by Frederic F. Hall who had financed the Klamath Development Company. It also appears that both Kinney and Lena signed notes for deferred payments to be made on the purchase price and that these notes were secured by a mortgage on the land.

Lena testified that when she and Kinney acquired the Kilgore land, each half was burdened with the same amount of encumbrance, and that there was no difference in the values of the two halves except that a more substantial building was on her half. Lena says that the two lots received by her from her husband were worth about $1,000 in 1913. Lena received from Minnie Hozin a promissory note for $100 and a relinquishment of the latter's equity in consideration of the conveyance of the two lots in Klamath Falls. According to the testimony of Lena, the parties fixed $1,500 as the value of the two Klamath Falls lots. The deed from Kinney to Corboff was dated August 22, 1916, and the one from Lena to Minnie Hozin was dated November 13, 1916. The deed from the Klamath Development Company to Kinney was dated November 1, 1916, and the deed from the company to Lena bore the same date. Both deeds from the Klamath Development Company were recorded April 10, 1917, at 3 P. M. M. L. Johnson testified that the papers for both halves to the Kilgore land "had been drawn up in the San Francisco office," and were ready for delivery whenever such of them as required the signatures of Kinney and Lena were signed. It had been discovered that there were two unpaid judgments against Kinney, and he was told that it would be necessary for him to satisfy those two judgments before his deed could be delivered to him. Johnson says:

"Mr. Kinney objected to paying the judgments, saying that they were unjust debts and he didn't feel morally obligated to pay them. I told him that the deal couldn't go through unless they were paid because the papers were all drawn up in his name. He said he wished he had known it before the deal started, he would have the whole property put in Mrs.

Barkhurst's name. I told him it was too late to make
any change in the papers now, the K. D. Co. had stood
attorney's bills on the thing, and spent a lot of time
on it and gone to a lot of expense, and it had to go
through as outlined, or not at all. Whereupon in due
course, Mr. Kinney cleared up the judgments and also
the back water charges against the property,''

Under date of July 30, 1917, Kinney conveyed his
half of the Kilgore land to Lena, and the deed was
recorded on the same day. One of the important
questions of fact presented for decision is whether
this conveyance was made in good faith and in pay-
ment of indebtedness due Lena, or whether it was
made to hinder Kinney's creditors. The defendants
say that the deed was given in satisfaction of a debt
of $800 at that time found to be due from Kinney to
Lena for services rendered by her as housekeeper.
This question of fact must be solved by what occurred·
before July 30, 1917, and also by what happened
after that date.

Lena says that she worked continuously for Kinney
as his housekeeper from February 4, 1912 until July
30, 1917, except about two months. During a period
of about two years she served as postmistress, and
received approximately $200 per year for her services.
She had no other income whatever except the wages
earned by her as housekeeper for Kinney and the
salary received for her services as postmistress. In
other words, the only moneys received and earned by
her during a period of five years and six months
were the wages earned as housekeeper and the salary
as postmistress. Giving to Lena the benefit of every
doubt and crediting her with four months each year
at $30 per month and all the remaining months during
which she worked at $15 per month instead of $10 per
month, the aggregate amount is approximately $1,260.

Lena says that she spent the $200 received as postmistress for clothing for herself and children. Lena claims that Kinney did not settle with her from time to time "as the months passed by" and no settlement was made until the execution of the deed on July 30, 1917. According to Kinney's testimony: "The first two years she received her pay." Lena testified that it was ascertained on July 30, 1917, that Kinney owed her $800. She says she kept an account-book and that she ascertained the amount from the book. Kinney states that he never saw the book, although he agrees with her that she estimated that $800 was the amount due and he accepted her estimate as correct. The defendants were called upon to produce the account-book, but they did not do so. It is true that there was testimony concerning the search made for the book at one place, but it is also true that there was testimony indicating failure to search another place where the book might have been if it was in existence. If Kinney owed Lena $800 on July 30, 1917, then she received from all other sources during the period of five years and six months not more than $860, and this sum must have represented the total expenditures made for herself and two children. However, Lena did not receive $860 in cash; for Kinney paid doctor bills incurred for one of her children, a cripple, amounting to between two and three hundred dollars. Whatever balance remains out of the $860 after deducting the doctor bills represents the total amount expended by Lena for herself and children during the period of five years and six months.

According to the testimony of Kinney, he was broke in 1909. He bought a threshing-machine and that transaction broke him again. Commencing with probably 1909, or at least as early as a few years prior to

July 30, 1917, Kinney owed creditors who were unable to collect the amounts due them. He was sued for money not only before November 1, 1916, the date when the Klamath Development Company deeded half of the Kilgore land to him, but also after that date. He was sued for money not only after November 1, 1916, and prior to July 30, 1917, the date when he conveyed his half of the Kilgore land to Lena, but also after July 30, 1917. He asserts that if he had money he would pay the judgments held by the plaintiff. Executions placed in the hands of the sheriff were returned with certificates of the sheriff showing *nulla bona.* The insolvency of Kinney is appropriately alleged and is proved by the evidence.

In October, 1916, H. F. Chapman deeded to Kinney 160 acres of land and Kinney gave a mortgage for part of the purchase price. Chapman says that Kinney

"advised me not to have my mortgage recorded; said he wasn't going to have the deed recorded. * * I asked him why and he says, 'They will come on to your creditors and take it away from you.' "

Chapman recorded his mortgage, but Kinney did not record his deed. Kinney failed to pay the note given for part of the purchase price, and the land reverted to Chapman.

On March 10, 1914, P. L. Fountain and C. K. Brandenberg conveyed 80 acres of land to B. A. Kinney, a son of the defendant Kinney. For this conveyance Fountain and Brandenberg received from the defendant Kinney three lots and two houses in Klamath Falls and some money. The "trade" was made with the defendant Kinney, and the conveyance to the son was made "at Mr. A. Kinney's directions." In 1918, B. A. Kinney deeded this land to Lena Bark-

hurst and on September 21, 1918, she conveyed it to
Hattie E. Marshall. The defendant Kinney ap-
proached A. L. Marshall who owned the land adjoin-
ing and asked him if he "didn't want to buy it,
stating that "Bud Kinney had gone to war and
Lena Barkhurst bought the property." The inter-
view resulted in the conveyance to Mrs. Marshall.

On November 19, 1917, Lena Barkhurst conveyed
the Kilgore land to Iva Drew, subject to the Hall
mortgage amounting to $1,760 and to a second mort-
gage in the sum of $845.32 in favor of the Klamath
Development Company. For this conveyance Charles
Drew gave a check for $1,600 payable to Lena Bark-
hurst and delivered twenty-eight head of cattle. Lena
says that she indorsed the check and gave it to Kin-
ney, who, both say, expended it for her.

Clarence Harris was paid $500 for his equity in the
Beaughan land, and the money paid him was a part
of the proceeds of the Drew check. The negotiations
leading up to this purchase were conducted by
Clarence Harris and Kinney. According to the
testimony of E. M. Chilcote who acted as scrivener
the papers as first prepared ran "to A. Kinney and
then later I was given instructions that contract
should be made out in the name of Lena Barkhurst,
and consequently the old papers were destroyed and
new papers made out in her name." Chilcote further
stated that "all of the instructions came from Mr.
Kinney and Clarence Harris."

Lew A. Davidson and wife conveyed the Davidson
land to Lena Barkhurst by deed dated April 2, 1918
and recorded July 10, 1918. William McClure con-
veyed the McClure land to Lena Barkhurst by a deed
dated July 9, 1918, and recorded April 28, 1919. The
negotiations were conducted by Davidson and Kinney.

Davidson was "trading" with McClure, and Kinney was "trading" with Davidson; and hence when the trade was consummated McClure deeded his land directly to Lena Barkhurst instead of to Davidson. In consideration for the Davidson-McClure land, Davidson received the equity which had been purchased from Harris, and Lena Barkhurst also gave her note to Davidson for $548 with a mortgage on the Davidson land as security for the note. At the time of the trial $400 of the principal of the note was unpaid. Lena Barkhurst took no part whatever in the negotiations with Davidson. The negotiations were conducted by Kinney as though he was the owner of the equity in the Beaughan land. Davidson testified:

"When we came to make the deeds, [Kinney] spoke about having run to his son; seems it was talked over for a while, then he said—in a few days afterwards he said he couldn't have it go to his son, son wasn't of age, wasn't old enough, so he would have the deed go to this Mrs. Barkhurst, I think; some lady, I think that is the name.

"Q. And the papers as finally executed, do you know how the deed run, to whom?

"A. Well, the first time that was made, the deed was made and give to me and I sent it to Mr. McClure to sign; it was made out,—deeding it to Kinney. When the deed came back, it didn't suit and Mr. Chilcote said, I think he said over there in the bank, would have to be made, deed to Mrs. Barkhurst; so there was another deed made and I signed it and Mr. McClure signed it, deed to Mrs. Barkhurst."

The testimony of Davidson concerning the proposal to deed the land to the minor son is in material particulars corroborated by two other witnesses. Furthermore, it will be observed that the McClure deed, which was finally delivered, is dated three months later than the Davidson deed.

At some time in 1918 Lena Barkhurst says that she contracted to purchase 320 acres of land known as the Martin place adjoining the Davidson-McClure land. The agreed purchase price for the Martin land was $1,800, and, according to the testimony of Lena, all but two or four hundred dollars has been paid. In the early part of 1919, probably May, Lena entered upon 240 acres of land as an original homestead. The homestead adjoins the McClure land.

Lena Barkhurst continued to act as housekeeper for Kinney until she entered upon her homestead in 1919. Since entering upon the homestead she has lived in a house upon the homestead during a part of the time, while Kinney has lived in a house on the McClure land most of the time. The record shows that Kinney alone without the aid of Lena Barkhurst conducted the negotiations which resulted in the sale to Drew, the purchase of the Harris equity, and the purchase of the Davidson-McClure land. Indeed all the business, which it is now claimed was conducted in behalf of Lena Barkhurst, was transacted by Kinney exactly as he would have done it if he had been conducting such business for himself. Lena admits that, except upon one occasion, she never sold so much as a single cow or calf without first consulting Kinney, and yet she claims to have been the owner of all the livestock and real property. Even up to the time of the trial Kinney managed the Davidson land as though he owned it. Every business transaction, except an occasional purchase or sale of one or more head of cattle, was conducted and managed by Kinney alone. In January, 1920, the date of the trial of this suit, we find Lena holding the record title to 320 acres of land with no encumbrance on it, except about $400, and an additional 320 acres of land with no indebted-

ness against it except two or four hundred dollars, and also possessing a homestead right to 240 acres of land. We find Kinney insolvent. And yet all the accumulations held by Lena were the fruits of Kinney's management.

Notwithstanding the fact that from July 30, 1917, until early in 1919, when Lena entered upon the homestead, she continued to act as Kinney's housekeeper, just as she had done from February 4, 1912, to July 30, 1917, she claims she did not consider that Kinney was indebted to her for services rendered after July 30, 1917; for, she asserts, ''he was helping me as well as I helping him then,'' and ''I just considered myself indebted to him after he has done so many things for me * * farmed my land, all such things as that.''

The plaintiff urges that the relationship existing between the defendants since February 4, 1912, has been of such a high degree of confidence that the burden of proof ought to be placed upon Lena satisfactorily to prove that Kinney conveyed his half of the Kilgore land for the consideration and in the circumstances claimed by her. It is not necessary to decide whether the same rule which governs husband and wife ought to apply to the conveyance from Kinney to Lena; for, even though we assume without deciding that the burden of proof rests upon the plaintiff throughout the trial, an examination of the record convinces us that the plaintiff has sustained the burden so assumed to rest upon him. No good purpose can be served by reviewing in detail all of the evidence relating to the controversy. The foregoing narrative contains only an outline of the most important features; but there are many additional circumstances which give support to the contention made by

the plaintiff. The record indisputably shows that Lena was the owner in her own right of one half of the Kilgore land. The evidence indicates that Kinney conveyed his half of the Kilgore land to Lena not for the purpose of satisfying an indebtedness due from him to her, but for the purpose of preventing his creditors from enforcing collection of debts due them. However, even though it be assumed for the purposes of the instant case that the conveyance of Kinney's half of the Kilgore land was for the purpose of paying Lena $800 due for services rendered by her, nevertheless the evidence clearly and convincingly shows that Kinney has an interest in the Davidson-McClure lands; and we think that such interest is not more than a one-half interest.

The decree is affirmed.        AFFIRMED.

---

Motion of respondent Bushong to dismiss appeal filed October 6, denied November 23, 1920, argued February 16, affirmed April 18, 1922.